IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PHL VARIABLE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>vs.<br><br>THE SHELDON HATHAWAY FAMILY INSURANCE TRUST, by and through its trustee, DAVID HATHAWAY,<br><br>    Defendant,<br><br>WINDSOR SECURITIES, LLC,<br><br>    Intervenor-Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br>Case No. 2:10-cv-67<br><br><br>Judge Robert J. Shelby |

Sheldon Hathaway took out a life insurance policy from Plaintiff PHL Variable Insurance Company and passed ownership of the policy to Defendants The Sheldon Hathaway Family Insurance Trust (the "Trust") and Trustee David Hathaway.  PHL Variable has filed suit to rescind this policy due to misrepresentations contained in the policy application.  PHL Variable now moves the court for summary judgment on its claims against the Defendants and against Intervenor-Defendant Windsor Securities, LLC, a company that paid the premiums on Mr. Hathaway's policy.  Windsor Securities has filed a cross motion for summary judgment.  The court finds that there are no genuine issues of disputed fact and that the false statements in the policy application were material misrepresentations upon which PHL Variable relied.  As a

result, the court GRANTS PHL Variable's Motion for Summary Judgement (Dkt. 131) and DENIES Windsor Securities' Cross Motion for Summary Judgment (Dkt. 128).

## FACTUAL BACKGROUND

Sheldon Hathaway is a previous employee of Newmont Gold Company, U.S. Steel, and Bechtel Corporation, where he worked as a heavy equipment operator and a welder and performed other industrial tasks. He is now retired and lives on fifteen acres of rural property in Payson, Utah, where he owns a residence and a non-commercial farm. His residence is valued at approximately $380,000. His ten acres of non-commercial farmland were valued at $530,000 in 2008, but decreased in value to $340,000 in 2012. Besides his residence and farmland, Mr. Hathaway owns only minor assets, including farm equipment, an older Jeep, and a Ford truck. He receives an income of about $30,000 per year from Social Security payments and company pensions.

Mr. Hathaway became involved in a stranger-originated life insurance (STOLI) scheme, in which a third-party investor obtains a life insurance policy for someone even though the third party has no interest in the continued life of the insured. Mr. Hathaway's involvement in this scheme began when his neighbor, Jay Sullivan, showed him a promotional brochure outlining life insurance policies financed through an outside investor that supposedly carried no liability for the insured. Mr. Sullivan promised Mr. Hathaway that the life insurance policy would cost him nothing and that he would receive a payment of $300,000 after two years when the policy was sold.

The application required disclosure of Mr. Hathaway's net worth. Mr. Sullivan performed these calculations and initially estimated Mr. Hathaway's net worth at $4,000,000.

Mr. Hathaway testified that he questioned Mr. Sullivan's calculations, but Mr. Sullivan assured him that his property was worth more than Mr. Hathaway thought.  On the final signed application, Mr. Sullivan listed Mr. Hathaway's net worth as $6,250,000 and his other income as $484,500.  In addition, the application contained representations that premium financing would not be used to pay policy premiums, and that neither Mr. Hathaway nor the Trust had any intent to transfer any interest in the policy to a disinterested third party.  Mr. Hathaway signed the application, although Windsor Securities asserts that Mr. Hathaway is illiterate and that he signed a blank application form before it contained any of this information.

A series of insurance brokers and insurance agents acting as intermediaries then transferred the application to PHL Variable.  Brock Diediker, an insurance intermediary working with Mr. Sullivan, passed the application to Gabriel Giordano, a licensed insurance producer, and his company, PRG Financial Resources, Inc. (PRG).  Mr. Giordano submitted the application to PHL Variable.  Mr. Giordano also submitted a "Producer's Report" on December 10, 2007, in which he stated that he had met Mr. Hathaway.  Mr. Giordano affirmed the information in the policy application regarding Mr. Hathaway's net worth, the lack of any prohibited financing methods, and the lack of Mr. Hathaway's intent to transfer his rights or interests in the policy.  In reality, neither Mr. Diediker nor Mr. Giordano ever met Mr. Hathaway.  The parties do not dispute this sequence of events, but Windsor Securities contends that Mr. Giordano was PHL Variable's agent because PHL Variable had a brokerage contract with him.

PHL Variable also sought confirmation of Mr. Hathaway's net worth from Infolink, a third-party verification service it routinely employed.  Infolink submitted an "Inspection Report" on December 5, 2007, in which Infolink stated that the calculations contained in the policy

application appeared to be accurate based on a conversation with Mr. Hathaway.  PHL Variable later learned that Infolink, like Mr. Diediker and Mr. Giordano, never contacted Mr. Hathaway or otherwise confirmed the calculations of Mr. Hathaway's assets and net worth.

   Mr. Hathaway's son, David Hathaway, is the trustee of the Trust.  Mr. Sullivan and the other intermediaries worked with David Hathaway to transfer money through various accounts in order to credit the Trust's bank account with sufficient funds to pay the $200,000 initial policy premium.  The ultimate source of these funds was the San Diego law firm of Sadr & Barrera, APLC, which is active in the secondary insurance market.  On March 7, 2008, the day before the initial premium was due, Sadr & Barrera transferred $200,000 into the Trust's bank account. These funds remained in the Trust's account for approximately one day before they were paid to PHL Variable.  David Hathaway witnessed Mr. Sullivan perform these transfers telephonically during a bank visit.

   PHL Variable issued the life insurance policy to Mr. Hathaway on January 31, 2008. The policy provided a death benefit of $4,000,000.  When the policy issued, PHL Variable paid a sales commission to Mr. Giordano.  PHL Variable had an Independent Producer Contract with Mr. Giordano, under which Mr. Giordano received sales commissions in connection with any PHL Variable product that Mr. Giordano sold.  PHL Variable also paid a sales commission on Mr. Hathaway's policy to the broker on the policy, Crump Life Insurance Services, Inc. (Crump). Crump was a general broker that PHL Variable hired to sell its insurance products.  Crump had a Top Producer Agreement with Mr. Giordano, under which Mr. Giordano received a portion of Crump's sales commission if Mr. Giordano's company, PRG, generated a certain level of sales for which Crump served as broker.

After Mr. Giordano received his sales commission, he paid a portion of the commission to Mr. Diediker and to New Concepts Financial Corporation, a company affiliated with Mr. Sullivan. Through PRG, Mr. Giordano also paid Windsor Securities $40,000. Finally, Windsor Securities made a payment of $200,000 to Sadr & Barrera. PHL Variable contends that this payment was made to refund the money that Sadr & Barrera provided to finance Mr. Hathaway's initial policy premium. Windsor Securities maintains that it believed the $200,000 payment was a reimbursement to the Trust and that it had no knowledge of Sadr & Barrera's involvement.

On December 18, 2008, the Utah Department of Insurance sent a letter to PHL Variable requesting information about Mr. Giordano. Alerted to the Department's investigation of Mr. Giordano, PHL Variable undertook its own internal investigation of five policies connected with Mr. Giordano, including Mr. Hathaway's policy. PHL Variable first attempted to confirm the information contained in the policies. When such confirmation was not forthcoming, PHL Variable engaged in legal action to rescind the policies. PHL Variable filed suit against the Trust on January 28, 2010. On April 13, 2011, the court granted Windsor Securities' motion to intervene.

## ANALYSIS

**I.      Standard of Review**

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## II.     Rescission of the Policy

PHL Variable moves to rescind the insurance policy on the grounds that the policy is part of a STOLI scheme.  The Utah Legislature has defined STOLI as "an act, practice, or arrangement to initiate a policy for the benefit of a third party investor or other person who has no insurable interest in the insured resulting in the requirements of [Utah's insurable interest statute] not being met."  Utah Code Ann. § 31A-36-102(18).  Under Utah law, an insurance contract may be rescinded due to a misrepresentation if  "(a) the insurer relies on [the misrepresentation] and it is either material or is made with intent to deceive; or (b) the fact misrepresented or falsely warranted contributes to the loss."  Utah Code Ann. § 31A-21-105(2). "In order to invalidate a policy because of a misrepresentation by the insured, an insurer need prove applicable only one of the above provisions." *Derbidge v. Mut. Protective Ins. Co.*, 963 P.2d 788, 790 (Utah Ct. App. 1998) (citations omitted).

The court first addresses the question of whether the Defendants made misrepresentations to PHL Variable because, "while the insurer must show only one of these three provisions has been met, under each alternative a threshold requirement is that the applicant have made a misrepresentation."  *Id.* at 791.

### A.     Misrepresentation

Under Utah law, a misrepresentation is "something more than an innocent misstatement." *Derbidge*, 963 P.2d at 795.  "Although the outright intent to deceive is no longer required in all cases, requiring that an applicant have at least some knowledge or awareness of her misstatement is consistent with principles of insurance law enunciated after Utah enacted statutory standards for misrepresentation."  *Id.* at 794.  Under this standard, a misrepresentation requires an act that

may fall short of intentional deception, but consists of more than mistake or negligence.

The Tenth Circuit discussed this standard in *ClearOne Communications, Inc. v. National Union Fire Insurance Co. of Pittsburgh*, 494 F.3d 1238 (10th Cir. 2007).[1] The Tenth Circuit interpreted the *Derbidge* standard as requiring "some level of bad faith before a misstatement may serve as a basis of rescission," *id.* at 1244 n. 3, and acknowledged that "Utah courts would apply a standard of recklessness to the insured's state of mind under the statute." *Id.* at 1247. Generally "[a] misstatement is not innocent under *Derbidge* if the applicant knew or should have known about its falsity." *Id.* For a misrepresentation to be an improper basis for rescission, "the insured must have no idea that the misstatements were inaccurate." *Id.*

Here, it is undisputed that Mr. Hathaway's life insurance policy application contained inaccurate calculations of his net worth and assets. PHL Variable also contends that the application contained misleading guarantees regarding Mr. Hathaway's intention to assign rights under the policy and the financing methods used to fund the policy. Even taking the facts in the light most favorable to the Defendants, these inaccuracies constitute misrepresentations. *See id.* at 1244 ("[F]alse financials constitute[] a misstatement for purposes of rescission."). Mr. Hathaway did not have an annual income of $484,500 and he was unable to afford the initial $200,000 policy premium.

Windsor Securities does not dispute these facts. Instead, it argues that Mr. Hathaway is illiterate and that therefore neither he nor the Trust can be said to have knowingly made the misrepresentations. The court is not persuaded by this argument. Under Utah law "an insured is

---

[1]Windsor Securities argues against application of *ClearOne* on the grounds that the case is from the Tenth Circuit, not a Utah court. The Tenth Circuit's interpretation of Utah law is nevertheless binding on this court.

under a duty to read his application before signing it, and will be considered bound by a knowledge of the contents of his signed application." *Theros v. Metropolitan Life Ins. Co.*, 407 P.2d 685, 688 (Utah 1965). And even if Mr. Hathaway was unable to read the completed application, no reasonable jury could find that Mr. Hathaway was unaware of the misrepresentations in his application. Mr. Hathaway knew, or at least strongly suspected, that the four million dollar asset figure that Mr. Sullivan quoted to him was an overestimate. At his deposition, Mr. Hathaway admitted that he questioned the inflated estimate. (S. Hathaway Dep. 46:7-10, Dkt. 133-1 ("Q: Did you tell him, I'm not worth $4 million? A: That's what I asked. I says, Jay, what are you talking about?").) Mr. Hathaway also admitted that he did not believe the figure. (*Id.* at 26:15-19.)

Given these facts, the court finds that the Defendants have presented no evidence that creates a genuine dispute about whether the Trust knew or should have known about the clear misrepresentations contained in Mr. Hathaway's insurance application.

B.     Reliance on a Material Misrepresentation

The court next addresses whether these misrepresentations were material and whether PHL Variable relied upon them in issuing the policy. "[A] material fact is one that would naturally influence the insurer's judgment in making the contract, in estimating the degree and character of the risk, or in fixing the rate of insurance." *ClearOne*, 494 F.3d at 1250 (citation omitted) (internal quotation marks omitted). "[W]hen an insurer specifically asks information in regard to a certain matter, the presumption is that the matter is material." *ClearOne Commc'ns, Inc. v. Lumbermens Mut. Cas. Co.,* 2005 WL 2716297, *13 (D. Utah Oct. 21, 2005), *aff'd in part sub nom. ClearOne Commc'ns, Inc.,* 494 F.3d 1238.

There is no dispute that PHL Variable requested information about Mr. Hathaway's net worth, assets, and sources of financing on the life insurance policy application form. As such, this information is presumed to be material. The Defendants have not presented any evidence to rebut this presumption. PHL Variable would not have insured Mr. Hathaway for $4,000,000 had it known the true extent of his assets. As PHL Variable points out, inflated asset and net worth figures distort the pricing policies of insurance companies and prevent them from accurately fixing the rate of insurance. Inflated asset and net worth figures also create the false impression of a legitimate estate need for a highly-priced life insurance policy. This false information led PHL Variable to issue a policy that had no correlation with Mr. Hathaway's actual insurance needs.

Windsor Securities argues that only facts affecting the risk of mortality are material to life insurance policies. Windsor Securities cites as support for this contention the case of *Berger v. Minnesota Mutual Life Insurance Co. of St. Paul*, in which an insured failed to disclose a diabetic condition. 723 P.2d 388, 391-92 (Utah 1988). Similarly, Windsor Securities argues that the court should apply the reasoning set forth in *Farrington v. Granite State Fire Insurance Co.*, a case involving failure to disclose the vacancy of a building in an application for fire insurance. In *Farrington*, the court found that the fact that the building was vacant was not material because it was unclear whether vacancy made it more or less likely that the building would have a fire. 232 P.2d 754, 758 (Utah 1951). But the Utah Supreme Court's rationale in these cases is broader than Windsor Securities suggests. In *Berger*, the court held: "The materiality of a fact misrepresented or withheld is determined by the probable and reasonable effect that a truthful disclosure would have had upon the insurer in determining the advantages of the proposed

9

contract." *Id.* at 391.  Here, the advantages of the proposed life insurance contract do not depend solely on the risk of mortality because the amount of insurance needed also depends on the finances of the insured.  PHL Variable is not concerned that it was misled as to the risks associated with Mr. Hathaway's life expectancy.  Rather, PHL Variable wishes to rescind the contract because the policy insures against a number of losses that Mr. Hathaway cannot suffer given his current financial situation, such as estate settlement costs and inheritance taxes.  Information about Mr. Hathaway's financial state is clearly material to the question of how much insurance Mr. Hathaway needs.

For these reasons, the court finds that there is no genuine dispute that PHL Variable relied on material misrepresentations about Mr. Hathaway's finances when it issued Mr. Hathaway's life insurance policy.  As a result, the court does not reach the question of whether these misrepresentations were made with an intent to deceive.  Regardless of the Defendants' intent, PHL Variable is entitled to have the policy rescinded.

### III. Affirmative Defenses

Windsor Securities asserts that PHL Variable is barred from rescinding the insurance policy for a number of reasons.  The court examines each of these affirmative defense and finds that none of them provides a reason why the policy should not be rescinded.

#### A. Waiver Based on Agency

Windsor Securities first argues that PHL Variable waived its right to rescind the contract because it had knowledge of the misrepresentations for over thirteen months before it decided to

bring suit.[2]  Windsor Securities' argument rests on the assumption that Crump, the broker on Mr. Hathaway's policy, and Mr. Giordano, the producer on Mr. Hathaway's policy, were agents of PHL Variable and that their knowledge can therefore be imputed to PHL Variable.

"To be an agent, a person must be authorized by another to act on his behalf and subject to his control."  *Gildea v. Guardian Title Co. of Utah*, 970 P.2d 1265, 1269 (Utah 1998) (quotations and citations omitted).  "The question of whether an insurance agent is the agent of the insurer or the insured is a question of fact."  *Vina v. Jefferson Ins. Co. of N.Y.*, 761 P.2d 581, 585 (Utah Ct.App. 1988).  But even taking the facts in the light most favorable to Windsor Securities, there is no genuine dispute that Crump and Mr. Giordano were not PHL Variable's agents.

Utah courts draw a distinction between insurance agents and insurance brokers.  An insurance agent is typically "a person expressly or impliedly authorized to represent [the insurer] in dealing with third persons . . . [and] is commissioned and employed by an insurance company to solicit and write insurance by and in the name of the company."  *Id.* at 585.  An insurance broker, by contrast, is "ordinarily the agent of the insured as to matters connected with the procurement of the insurance."  *Id.*  An independent agent who solicits insurance for an insured and places that insurance with an insurance company is, "if anyone's agent, the agent of the insured and not of the insurance company."  *Id.*

Here, Crump and Mr. Giordano were at most insurance brokers for PHL Variable.  The relationship between PHL Variable and Crump was governed by a Brokerage General Agent

---

[2]Windsor Securities also argues that PHL Variable waived its right to rescind the contract based on its knowledge and conduct during the thirteen-month period from December 2008 to January 2010.  The court discusses this argument below.

11

agreement, while the relationship between PHL Variable and Mr. Giordano was governed by an Independent Producer Contract. These agreements contain provisions about the use of company property, indebtedness and indemnification, and refund of premiums, but they do not establish an agency relationship between PHL Variable and either Crump or Mr. Giordano.

It is undisputed that Crump and Mr. Giordano could not unilaterally bind PHL Variable into issuing an insurance policy to Mr. Hathaway before Mr. Hathaway first submitted an application to PHL Variable. Without this ability, Crump and Mr. Giordano could not be agents of PHL Variable. *See id.* at 586 (citing with approval a Louisiana case holding that an insurance salesperson was not the agent of the insurer where the salesperson could only quote premiums and could not bind insurer prior to the insurance company's approval).

Moreover, it is undisputed that Mr. Giordano (through Crump) submitted Mr. Hathaway's insurance application to multiple insurance carriers. If the court adopted Windsor Securities' line of reasoning, Crump and Mr. Giordano would be agents of all of these companies. Given these facts, the contractual relationships between Crump and PHL Variable and between Mr. Giordano and PHL Variable did not create an agency relationship. As a result, any knowledge of the misrepresentations in Mr. Hathaway's policy application possessed by either Crump or Mr. Giordano cannot be imputed to PHL Variable.

   B.  <u>Waiver Based on Course of Conduct</u>

Windsor Securities also contends that PHL Variable waived its right to rescind due to its own conduct and knowledge. Under Utah law, "an insurer may forfeit the right to rescind a contract if it intentionally relinquishes that right or if its course of conduct demonstrates that it intended to relinquish that right." *Continental Ins. Co. v. Kingston,* 114 P.3d 1158, 1161 (Utah

Ct. App. 2005). Windsor Securities does not argue that PHL Variable expressly relinquished its right to rescind the life insurance policy, but instead asserts that PHL Variable's conduct is evidence of an intent to relinquish.

Windsor Securities contends that four of PHL Variable's actions demonstrate its intention to relinquish its right to rescind. First, Windsor Securities points out that PHL Variable sent Mr. Hathaway a letter on May 5, 2009, seeking verification of the financial information contained in Mr. Hathaway's application. But this letter merely demonstrates that PHL Variable was investigating possible misrepresentations in Mr. Hathaway's application. There is no reason why PHL Variable should have moved to rescind Mr. Hathaway's policy immediately upon learning in December 2008 that the Utah Department of Insurance was investigating Mr. Giordano. Instead, PHL Variable reasonably sent Mr. Hathaway a letter asking for confirmation of his information and advising him that the company would seek rescission if he did not provide evidence that his policy application was truthful.

Second, Windsor Securities notes that PHL Variable did not initially challenge Windsor Securities' request for a collateral assignment in July 2009, but instead sent the Trustee a letter asking for a signature to process the assignment request. Windsor Securities' argument is not persuasive. PHL Variable's stock response requesting a signature to process an assignment request does not constitute a distinct recognition that Mr. Hathaway's policy was in force, especially when PHL Variable ultimately rejected Windsor Securities' request on the grounds that the request was made during an ongoing investigation into possible misrepresentations in the policy application.

Third, Windsor Securities argues that PHL Variable waived its rights to rescind because it

accepted a $20,000 payment under the life insurance policy two months after filing this lawsuit. But it is undisputed that PHL Variable's title department reviewed the $20,000 deposit[3] and, determining that it related to a life insurance policy that was the subject of active litigation, immediately sent a refund to Windsor Securities. The fact that Windsor Securities did not deposit PHL Variable's check does not demonstrate that PHL Variable had an intent to relinquish its right to rescind.

Finally, Windsor Securities alleges that, after PHL Variable accepted the initial $200,000 premium payment, PHL Variable continued to make monthly deductions from the account that held this payment past December 2008. But it is undisputed that Windsor Securities was not required to pay the entire first year premium amount up front. Additionally, PHL Variable made clear that it would automatically deduct funds from any overpayment to cover the costs of keeping Mr. Hathaway's policy in force. The fact that PHL Variable continued to perform in accordance with the insurance contract while it was investigating possible misrepresentations does not constitute an intentional relinquishment of PHL Variable's right to rescission.

Even though PHL's actions do not demonstrate an intent to relinquish its rights, Windsor Securities alleges that PHL Variable nevertheless waived its rights because it had knowledge of misrepresentations in Mr. Hathaway's policy application by December 2008. Windsor Securities points to PHL Variable's investigation, which it commenced after receiving a letter from the Utah Department of Insurance concerning Mr. Giordano. PHL Variable's answers to

---

[3] Windsor Securities' $20,000 payment was deposited by Boston Financial after the payment was received in PHL Variable's Boston office. As required by standard operating procedures, Boston Financial then forwarded an image of the check to PHL Variable, where it was reviewed by PHL Variable's title department.

interrogatories indicate that this investigation resulted in a report to PHL Variable's law department in December 2008. The report contained information on five insurance policies that Mr. Giordano handled, including Mr. Hathaway's application. But while it is clear that PHL Variable had become suspicious of the statements in Mr. Hathaway's application by December 2008, there is no reason that PHL Variable should have immediately moved to rescind Mr. Hathaway's policy before ascertaining that the policy application contained misrepresentations. On the contrary, PHL Variable's actions were reasonable. After sending Mr. Hathaway an inquiry on May 5, 2009, and failing to obtain any response, PHL timely commenced this lawsuit before the standard two-year contestability period expired.

Accordingly, the court finds that PHL Variable did not waive its right to rescind the policy.

### C. Spoliation of Evidence

Windsor Securities alleges that PHL Variable caused the loss of key evidence in this case because it did not file the lawsuit in December 2008. The court notes that Windsor Securities presents no compelling evidence of spoliation. But the court need not consider the merits of this defense because Windsor Securities fails to provide any authority discussing a legal rule or equitable consideration that would make this loss of evidence, even if placed beyond dispute, legally relevant as an affirmative defense.

### D. Policy Void *Ab Initio*

Windsor Securities contends that, under Utah law, a contract induced by fraud is not void but only voidable, with the injured party retaining the right to affirm it or treat it as valid. *Frailey v. McGarry*, 211 P.2d 840, 845 (Utah 1949); *see also U.S. v. Johnson*, 584 F.3d 995, 1003 (10th

Cir. 2009) ("While under Utah law a contract induced by fraud [or] false representations . . . is not void at its inception, it is, nevertheless, voidable." (citations and internal quotation marks omitted)). Windsor Securities argues that PHL Variable is therefore not entitled to a declaration that the life insurance policy is void *ab initio*. The court declines to address this argument. Even if the policy is merely voidable, PHL Variable has chosen to exercise its right to void the contract. PHL Variable is entitled to rescission of the policy regardless of whether the policy was void from its inception or has simply become void. This distinction does not affect the outcome of the case.

### E. Lack of Insurable Interest

Finally, Windsor Securities asserts that an insurance policy is not void for lack of insurable interest under Utah law. As a result, Windsor Securities argues that the court must dismiss PHL Variable's second cause of action, in which PHL contends that Mr. Hathaway's policy should be rescinded because the policy lacks an insurable interest. But PHL Variable did not move for summary judgment on this claim. In any event, this alternative ground for relief is moot because the court holds that summary judgment is proper under PHL Variable's first cause of action for rescission. As a result, the court need not determine whether Mr. Hathaway's policy is void for lack of an insurable interest.

## IV. Equitable Adjustment of Premiums

Having held that PHL Variable is entitled to rescind Mr. Hathaway's policy, the court now addresses whether it is equitable to allow PHL Variable to keep the premiums that Windsor Securities has already paid on the policy. PHL Variable seeks retention of these payments to cover its damages related to issuing the policy, paying brokers, and incurring attorneys' fees and

costs. The court agrees that PHL Variable is entitled to keep the premium payments.

In general, rescission of a contract should return the parties to the position they were in before they entered into the contract. In life insurance cases, this doctrine generally allows an insured to recover the premiums they have paid. *See Anderson v. Doms*, 75 P.3d 925, 928 (Utah Ct. App. 2003). But rescission is an equitable doctrine, and the court has discretion to depart from the general rule when equity so requires:

> [While the] goal of rescission is to restore the status quo that existed prior to the parties' agreement . . . [t]he status quo rule is not a technical rule, but rather it is equitable, and requires practicality in adjusting the rights of the parties. How this is to be accomplished, or indeed whether it can, is a matter which is within the discretion of the trial court under the facts as found to exist by the trier of fact.

*Dugan v. Jones*, 724 P.2d 955, 957 (Utah 1986).

A number of courts have allowed insurers to retain premium payments for insurance policies that were obtained fraudulently. *See, e.g.*, *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796-97 (6th Cir. 2009). Several of these cases were brought by PHL Variable and involve facts that are analogous to those that are presented here. *See PHL Variable Ins. Co. v. The P. Bowie 2008 Irrevocable Trust*, --- F.3d ---, 2013 WL 1943820 (1st Cir. May 13, 2013); *PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust*, 2010 WL 2539755, at *1-2, 4 (D. Minn. Mar. 13, 2010) (unpublished). The court agrees with the reasoning in these cases. A rule requiring PHL Variable to repay policy premiums on a fraudulently procured life insurance policy "would have the perverse effect of reducing the defrauder's risk relative to the honest policyholder; any defrauder could commit to paying premiums knowing that if the premiums ever became unaffordable, he could simply declare his fraud and receive all of the previously paid premiums back." *Wuliger*, 567 F.3d at 796-97. Such a rule "would be an invitation to

commit fraud." *Lucille E. Morello 2007 Irrevocable Trust*, 2010 WL 2539755, at *4.

The facts and circumstances here strongly support a finding that Windsor Securities was aware of the fraudulent scheme that Mr. Giordano and others perpetrated on PHL Variable. Windsor Securities was involved in the series of money transfers that obscured the true source of the funds for Mr. Hathaway's initial policy premium. But the court need not determine that Windsor Securities' intent was fraudulent to allow PHL Variable to retain the initial premium payment. If the court ruled otherwise, PHL Variable would not be returned to the position it was in before it issued Mr. Hathaway's policy because PHL Variable paid commissions to Crump and Mr. Giordano in excess of the cost of the first year premiums. In contrast, Windsor Securities would profit from the return of the initial premium payment because Windsor Securities has already received $40,000 from Mr. Giordano in return for financing the policy. Given these facts, it would not be equitable to refund the policy premiums to Windsor Securities.

Windsor Securities argues that, under *U.S. Fidelity v. U.S. Sports Specialty*, an insurer in Utah is barred from seeking reimbursement from an insured unless the written terms of the policy provide for reimbursement. 270 P.3d 464 (Utah 2012). Windsor Securities contends that the court should follow *U.S. Fidelity* because Mr. Hathaway's life insurance policy, like the insurance policy at issue in *U.S. Fidelity*, does not allow for an express right of reimbursement. But *U.S. Fidelity* only addressed an insurer's rights against an insured, not a third party. Here, there is no contract between Windsor Securities and PHL Variable. The return of premiums does not affect the insured because Mr. Hathaway did not pay for the initial premium. Consequently, the holding in *U.S. Fidelity* is not apposite to the facts presented in this case.

Windsor Securities also argues that PHL Variable has a valid contractual remedy to

recover its damages because it can file suit against Crump and Mr. Giordano for the return of the sales commissions on the policy. But there is no reason why PHL Variable is required to recover its damages from either Crump or Mr. Giordano. Instead, it is more equitable to place this burden on Windsor Securities. If Windsor Securities is truly an innocent party in this matter, it may file suit against Crump, Mr. Giordano, and the other actors who caused it to become involved in a fraudulent scheme.

The court is not persuaded by Windsor Securities' arguments. Instead, the court exercises its equitable discretion to allow PHL Variable to retain the initial premiums that Windsor Securities has already paid.

## CONCLUSION

For the reasons stated above, PHL Variable's Motion for Summary Judgment (Dkt. 131) is GRANTED. The court ORDERS that Mr. Hathaway's life insurance policy be rescinded. The court FURTHER ORDERS that PHL Variable retain the initial policy premiums. Windsor Securities' Motion for Summary Judgment (Dkt. 128) is DENIED. The Clerk of Court is directed to close the case.

SO ORDERED this 2nd day of December, 2013.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge